Luthy v. Waterbury.

39 317
140s 664

FERDINAND LUTHY AND CHARLES T. LUTHY, CO-
PARTNERS,

v.

JAMES M. WATERBURY AND CHAUNCEY MARSHALL,
COPARTNERS.

*Sales—Action on Contract for Sale of Binding Twine—Construction of —Guaranty of Quality—Provisions as to Sales by Seller to Others at Less Price than Provided in Contract—Instructions.*

1. In an action on a contract for the sale of binding twine, which contained a guaranty of the quality of the twine sold, where the vendor claimed that the twine was not up to the guaranty, it is *held:* That the defendants had received all the allowance in the verdict and by *remittitur*, to which they were entitled under the evidence.

2. Under a clause in the contract which provided that in case of sales to others during the season at a less price than that fixed in the contract with defendants, the defendants should be entitled to a corresponding reduction, it is *held:* That the evidence failed to show that sales had been made at a less price as claimed.

3.  A clause in the contract provided that should the appellees, or another company named, sell twine during the season at a less price than that named in the contract, the appellees would make a corresponding reduction: *Held:* That this clause did not apply to a sale already made, and second, that it had *no reference to more favorable terms given to appellants* by the other company named, by way of receiving back unsold twine at the end of the season.

[Opinion filed August 3, 1891.]

APPEAL from the Circuit Court of Peoria County; the Hon. T. M. SHAW, Judge, presiding.

This is an action of assumpsit brought by the appellees against the appellants, Luthy & Co., on a promissory note, dated May 10, 1889, for $19,000, payable November 10, 1889, and also upon an open account for $2,869.92. To this the defendants oppose a plea of the general issue and two pleas of set-off. Upon a trial by the jury the appellees obtained a verdict for $21,798.92. The defendants moved to set aside the verdict and for a new trial, whereupon the appellees entered a *remittitur* for $858.92 on the verdict, and the court thereupon denied the appellants' motion, and rendered judgment against the appellants for $20,939.60, from which the appellants prayed an appeal to this court.

It appears from the evidence in the case that with what the jury allowed and the *remittitur*, the appellants must have obtained a set-off against appellees' claim of $1,522.32; but with this set-off the appellants are not satisfied, and claim a large amount in addition. It appears that on the 4th day of April, 1889, the appellees, residents of the city of New York, entered into a contract in writing with the appellants, residents of the city of Peoria, Ill., whereby the appellants agreed to sell to appellees, binder twine at Peoria, Ill., Omaha, Neb., and various other points in the northwest, as per list attached to the agreement, and amounting to 424,548 pounds at thirteen cents per sisal, either white or stained; fourteen cents for mixed, tagged standard half and half, or standard manila; fifteen cents for pure manila, tagged pure manila or stand-

ard manila, free of all charges for freight, storage, insurance and other expenses until the warehouse receipts were turned over for same to appellants, etc. The money was payable by note on receipt of the invoice, one-third September 10th, one-third October 10th, and one-third November 10th, 1889.

The appellees agreed and guaranteed that the twine was in good condition and a merchantable article, and further guaranteed that should the National Cordage Company or the appellees sell twine during the season at less prices than the above they would make a corresponding reduction on the twine. It was further agreed that the contract should not be considered to in any way affect the contract existing between the National Cordage Company and the appellants. It was further agreed that if the appellants should be in want of more twine for that season, they were to give appellees the preference of their future orders at above prices of corresponding market rate at the time, for 250 tons additional twine. Prior to that time, on the 29th day of March, 1889, an agreement had been entered into between the appellants and the National Cordage Company, a corporation of the city of New York, whereby the latter agreed to sell to the second party 1,000 tons of binder twine on the following conditions: Prices per sisal twine to average 500 feet per pound, thirteen and one-half cents f. o. b. New York; prices for half and half twine to average 550 to 575 feet per pound f. o. b. New York; prices per manila twine to average 600 feet to the pound, fifteen and one-half cents f. o. b. New York. Appellants to have privilege of ordering twenty-five per cent of the above quantity, to be made up out of mixture of five to ten per cent of manila, balance sisal, to average about 575 feet per pound at thirteen and one-half cents f. o. b. New York, special tag to be furnished for same at the expense of appellees, * * * sixty days credit or cash in ten days less one-half per cent, four months extra credit if desired at six per cent per annum.

The appellees agree if they or any members of the National Cordage Company during the season make lower prices or more favorable terms, which would be equivalent to lower

prices to any one, that a corresponding reduction would be made to appellants on the contract. It was further agreed that appellees should take back all twine unsold and remaining in the second party's hands at their principal place of business only, on or before the 1st day of November next following, at prices paid. Twine to be delivered to first party on or before that time, in good order and without expense, at points above designated. Prices are always to be considered f. o. b. New York, and freights to be added to deliveries from western mills to equalize such deliveries. The sellers agree that after their total sales this season have amounted to 12,000 tons, that they will sell no more twine during this season of a less price than one cent per pound advance on prices named. James M. Waterbury, while being a member of the firm of Waterbury & Co., was at the same time president of the National Cordage Company, and a friendly feeling existed between the appellees and the National Cordage Company. It appears from the evidence that there was returned 731,100 pounds, and that there was 500,000 pounds additional not returned. When the appellants came to settle with the National Cordage Company, they paid them twelve and one-half cents for sisal, twelve and one-half for mixed, and thirteen and one-half for standard manila.

This reduction was given on this twine because there had been a decline in the price of twine. It appears from the testimony of Charles L. Luthy, one of the appellants, that the settlement was based on the fact that there had been a reduction in the price.

Messrs. PUTERBAUGH & PUTERBAUGH, for appellants.

Messrs. MCCULLOCH & MCCULLOCH, for appellees.

LACEY, P. J. One of the complaints made by appellants and insisted on for cause of reversal is that the appellees are liable on the contract of warranty of the good and merchantable condition of the twine, insisting that it was not in as good condition as warranted. It must be admitted that the evidence

Luthy v. Waterbury.

to some extent tends to support the claim of appellants in that regard, especially as to the condition of twine stored at Lisbon, Valley City, Osnabrook and Aberdeen, but we think there was very little evidence of any serious defects in the twine stored at any other points, and it also appears that there were some small sums of money due appellants for other items of accounts, amounting to seventy odd dollars. As to those items, or so many of them as the jury may have seen proper to allow, and including the damages resulting from a breach of the warranty as to the condition of the twine, we think all are covered by the amount of the reduction in favor of appellants' claims made by the jury and the *remittitur* entered by appellees. It will not be necessary for us to go over and canvass the evidence in detail to show that the appellant can not reasonably claim on that score more than they have been allowed, and indeed they might without doing any violence to the evidence have been allowed less. The twine that appellants purchased was carried over from the last year and both parties must have known that it would not be in the excellent condition of new twine; and such we think was not contemplated by the parties to the contract. For example, the 137,000 pounds of twine in appellants' own warehouse in Peoria is objected to as not being up to the warranty. But as to this twine, Charles L. Luthy, one of appellants, says in his testimony: "I don't think the twine in our warehouse was in good condition, but it was not as bad as it might have been. Some of it was in bad condition. For carried-over twine it was in fairly good condition. I think it was fairly marketable." It will be observed, too, that the contract price of this old twine was less by one-half cent per pound and the cost of freight from New York than the new twine purchased of the National Cordage Company in New York, and this difference no doubt was made on account of the former being old twine and the latter new, and therefore more marketable than the old. The same may be said of much of the old twine purchased and stored in the Western States. Therefore we think there is no error in the record as regards the credits received on account of the claims above named.

The main supposed defense to a portion of the appellees' cause of action arises under the following clause in the contract with the appellees for the sale of the twine, to wit: " The party of the first part hereby guarantees that should the National Cordage Company or the party of the first part sell twine during the season at less prices than the above, they will make a corresponding reduction on this twine." It is now insisted and was on the trial in the court below that the warranty contained in the above clause in the contract failed in this, that the appellees as well as the National Cordage Company sold twine in specific instances during the season of 1889 at less prices than those mentioned in the contract, and that therefore, under the guaranty, the appellants had the right to set off such reduction against the claims of the appellees sued on, to the same extent per pound of the twine sold as was made during the season in other contracts, either by the National Cordage Company or appellees. And this is the question we will now consider.

The sales whereby it is claimed appellees reduced the price of binder twine are two: one made to Smith Wagon & Implement Company of Minneapolis, Minn., of 400,000 pounds of twine, of which all was returned to appellees except 21,078 pounds, and the other was a sale of 500 pounds of twine to L. Freeman & Company, Grand Forks, Dak., at fourteen and one-half cents per pound for manila. There are other sales claimed in the argument to have been made by appellees wherein prices were reduced below the prices named in the contract in question, but upon examination we find no reduction, and we will, therefore, not take up our time in going over them. There was one contract and sale made by the National Cordage Company in which it is insisted that the price was reduced in various ways below that contained in the purchase made by appellees in question, to wit, the contract and sale made by said National Cordage Company to appellants of 1,000 tons of twine of March 29, 1889, mentioned in the statement of the case above. We will now proceed to consider the testimony and the law embodied in the instructions as applicable to the facts in the above cases of sales or supposed sales of binder twine.

The first we shall notice is the alleged sale of twine to the Smith Wagon & Implement Company. By a reference to the record we find there was evidence produced before the jury by the witnesses Waterbury and Marshall, to the effect that the 400,000 pounds of twine claimed to have been sold to the Smith Wagon & Implement Company was in fact not sold to it but sent in consignment to be sold on a commission of five per cent, and that when a settlement was made there was found to have been sold only 21,078 pounds of the twine by the Smith Wagon & Implement Company and the balance returned, and three-fourths of a cent a pound was allowed in addition to the commission on a settlement with the consignees. If this was the nature of the transaction, the jury being the judges of the facts so far as that transaction was concerned, they were justified in finding that there was no sale at less prices per pound for the twine furnished than was named in the contract between appellants and appellee in question. If the Smith Wagon & Implement Company were the mere agents of the appellees and the transaction between it and appellees was not an evasion intended to protect the appellees from forfeiture on appellants' contract, then there was no sale within the meaning of the contract, and the jury, we think, was justified in its verdict in finding there was no evasion. It appears by the evidence of James M. Waterbury that the three-fourth cent per pound reduction on the twine consigned to the Smith Wagon & Implement Company was made because it could not make collections on the amount sold and only on the amount sold, and this was made, not in pursuance of any previous understanding, but in closing up the transaction. If this be so it would not be a sale within the meaning of the contract in question. We now come to the consideration of the sale made to L. Freeman & Company of the 500 pounds of twine made September 1, 1889. This sale does not appear to be much relied on by counsel for appellants as showing a reduction of prices as contained in appellants' contract, but still it is claimed and we will consider it. The evidence shows, or at least tends so to do, that the twine season means that portion of the year during the continuance

of harvest, in which the twine is used for the purpose of binding sheaves of grain, and commences about January 1st and ends about August 1st, after harvest.    James M. Waterbury and Chauncey Marshall both testify to this, and Ferdinand Luthy, one of the appellants, testifies that the word " season" used in the contract " would apply to twine disposed of during the year 1889.    It varies some in different parts of the country.    *    *    *    In Dakota we have binding twine used after September 1st.    Sometimes the harvest is not over there until September 1st.    *    *    *    The harvest is generally over by September 1st.    I consider the season over when the harvest closes," etc.    This sale of the 500 pounds of twine was in itself a very insignificant matter, and, as we think, the appellants failed to show that it was made during the season, but rather after its close, and could not possibly affect the market of twine during the season.    We suppose this clause was inserted in the contract for the purpose of protecting appellants in their retail or jobbing trade, and to compensate them by reducing the purchase price of their twine for what they would or might lose by reason of any reduction in the wholesale price of twine by appellees or the National Cordage Company, and in fact it was intended to put appellants on an equal footing as respected the price of twine during the season with the other customers of appellees and the Cordage Company, so that they might be enabled to compete in the retail or wholesale market with any other purchasers of twine from them.    Considering the sale of the 500 pounds of twine to L. Freeman & Co., and the time and circumstances, it would seem to us that it could not be considered or held to be a substantial breach of the contract, or in other words, a selling during the season at less prices than those mentioned in the contract, and the jury was justified in its verdict in that respect.

We will now come to consider the last complaint, and that is the supposed reduction of the prices in the National Cordage Company's contract with appellants, dated March 29, 1889, set forth in the statement of the case herein.    After due consideration of the matters we are of the opinion there could

Luthy v. Waterbury.

be nothing claimed on that account. It is claimed by appellants' counsel that after the close of the season in the month of February, 1890, the Cordage Company reduced the price of twine all around on an average of one cent per pound on the contract with the appellants; that this was done under an indefinite promise as to amount made to appellants in July, 1889, and was done because, as the Cordage Company informed them, they were reducing prices, and it was a voluntary matter on the part of the company and not upon any demand made by the appellants. For this reason it is insisted that the price in appellants' contract should be reduced correspondingly, and further, inasmuch as by the terms of the contract with the Cordage Company with appellants, the said company was to buy back all the twine unsold at the end of the season at the contract price, and the contract with appellees did not so provide; that that was more favorable in its terms to the amount of one cent per pound on the price of the twine, and hence they should be allowed a like reduction on the twine purchased of appellees. It does not seem to us that this claim can be sustained, or that the contract with appellees will bear any such construction. The contract with the National Cordage Company was dated four days prior to the contract with appellees, and it was known to both parties at the time appellees' contract was made, that such contract had been made, and what its terms were, and especially that it provided for the return of the unsold twine. Appellees' contract did not so provide. If appellants' contention be correct, then the moment appellees' contract was executed, notwithstanding it had no such provision in it, appellants, by virtue of the clause to reduce in case other contracts of sale by appellees or the Cordage Company thereafter to be made, reduced the price of twine, were entitled to a corresponding reduction instanter; and according to appellants' contention there should have been a credit entered on appellees' contract with appellants then and there, to the extent of the value of the advantage there was in the privilege to return, as was given in the Cordage Company's contract, if the price thereby was reduced below those in appellees' contract. We think the contract

with appellees had reference to the sale to be made, if any, by them in the future, and had no reference to past sales, such as the one already made by the National Cordage Company. As to that claim for reduction, without reference to any other reason, we will say that there can be no basis for it. We are inclined to hold and think that as to the National Cordage Company's contract, and all that was, or could be done under it, without changing its terms thereafter, it could not affect the clause in appellees' contract in reference to the reduction of prices for twine. It should in our opinion be held to mean sales to other parties than appellants. The very object of such a clause, as we have before said, was to protect appellants in their trade in the resale of the twine. How, it may be asked, could appellants be injured by a subsequent sale to themselves by appellees or the Cordage Company of twine at a reduced price, provided no other such sales were made to other parties. A reduction of the price, even a gift of the twine, by the National Cordage Company or appellees, could only work to their advantage, not their disadvantage, and the same would be true as to any reduction by means of a new contract of prices named in the National Cordage Company's contract in question, even if made during the season, of which there is no evidence. But from the evidence we think the jury was justified in regarding the rebatement of the one cent per pound of the twine sold to appellants by the Cordage Company, as not a selling of the twine within the meaning of appellees' contract, but a mere rebatement, or gratuity, not agreed upon till after the season was over. Again, the contract of the Cordage Company made provision in terms for reduction in certain contingencies, and the sale was made on those conditions. It required no new agreement between appellants and the Cordage Company to reduce, to entitle appellants to a reduction; the only instance required was that the Cordage Company should make sale to other parties at less prices than named in appellees' contract with them, then the reduction followed as a matter of right. If the prices named in the Cordage Company's contract with appellees became reduced under its terms by reason of sales

or reduced prices to other parties and not by any new agreement, was that not by virtue of the terms of that contract and sale? If that be so, this contract antedated the one with appellees, and the sale of the twine was made prior to the contract with the latter. The latter contract only provided against sales made after its date, and not those made prior thereto. If the contract to sell and the delivery of the twine during the selling season under the terms of the contract, in pursuance of such contract, be regarded as the sale, then the Cordage Company's sale in the manner the contract of sale provided, was made when dated, and can not be regarded as a new sale. It would be no different than if the contract with the Cordage Company had been originally for a less price per pound for twine than the one subsequently made with appellees. Nor would the fact that the National Cordage Company submitted to a reduction in prices be evidence against appellees, that such company had sold for less prices than were named in appellees' contract. If the Cordage Company, reduced prices in sales other than the sales to appellants below those in appellees' contract, it was the duty of appellants to show it, and such reduction when proved would be a basis for reduction of appellees' prices named in the latter's contract. We, for the above reasons, conclude that the contract, in no particular, of appellant with the Cordage Company, was in view of the parties when the contract now in question was made, and the former was not embraced within its terms.

The appellants insist that a proper construction of the contract by which it was agreed that "in case the National Cordage Company or the party of the first part (should) sell twine during the season at less prices than the above, they will make a corresponding reduction on the twine," would embrace all other advantageous terms of sale by reason of which the buyer may be indirectly benefited, such as the privilege to return the unsold twine and the giving of longer time to pay for the twine without interest. But we are inclined to think such favorable terms as mentioned can not be fairly considered to be embraced in the terms "less price."

The word price, as is generally understood, embraces the

thing paid in consideration for the article sold, and when speaking of the price paid at Peoria for an article shipped from New York City, the cost of the freight may be added to the cost in New York to show the price or cost of the article in Peoria; but we think the privilege to return could not reasonably be embraced in the term "price" of the article. It will be seen by reference to the contract with the National Cordage Company that the contract in regard to lowering the price of the twine is quite different from the terms of the contract on the same subject with appellees. The second section of the former contract provides, the first party hereby agree, "That if they or any of the members of the National Cordage Company during the season makè lower prices, or more favorable terms, which would be equivalent to lower prices, to any one, that a corresponding reduction be made to the second party on this contract."

Appellees' contract only guarantees against the selling of twine during the season at less prices. We think there is quite a distinction to be drawn between the two contracts as we have indicated above, and this, we think, embraces the question of the time of payment as well as the agreement to allow unsold twine to be returned. The fifth and sixth instructions given for appellee are complained of. They hold that the warranty of the good condition and merchantable character of the twine provided for in appellees' contract is to be taken to refer to the time when the said contract was made, and that if the twine became in a bad condition afterward, the warranty would not embrace it. We find by reference to the contract that the warranty refers to the condition of the twine at its sale and not to its condition at any future time. Of course if the twine was in bad condition at the time appellants obtained possession of it, it might be proved, tending to show that it was in that condition at the date of the contract, unless the evidence should show to the contrary. But we think that the defendant got the benefit of such evidence and we find by reference to the appellants' first instruction given by the court that they refer to the warranty as taking effect at the date of the contract, the same as appellees' instruction; therefore the

appellants are not in a condition to raise such an objection to the said instructions five and six. Also appellants object to the giving of the appellees' fourth and eleventh instructions. The following portion of the fourth instruction is complained of, to wit:

" To pay no regard to the claim made by defendants that there was an advantage accruing to the purchaser by reason of there being a provision in the contract whereby he was accorded the privilege of returning to the seller all twine remaining unsold at the end of the season, unless the jury believed from the evidence that such privilege of returning affected the market value of the twine sold with such privilege."

It will be seen from what we have said above that with reference to the contract here in question the instruction is not erroneous and was as favorable to appellants as they could ask, and therefore the refusal of the court to give the appellants' fourth instruction asked was proper.

The eleventh instruction is as follows : " Although the jury may believe that the National Cordage Company, or the plaintiffs, made on settlement for sales previously made of other twines than those sold by the plaintiffs to the defendants, such settlements would not amount to sales within the meaning of said contract, if made after said contract had been fulfilled on the part of the seller, unless in pursuance of a prior promise, under valuable consideration, nor would such settlement amount to sales, unless made before completion of the contract by the seller, unless the same was made upon a previous, and upon a good and valuable consideration; that is, a mere concession by the seller to the buyer, on a settlement of a past sale, which the seller is under no legal obligation to make, can not be held to affect the original terms of the sale."

We think the law as we have above indicated was properly given in this instruction. We have now considered all the questions raised by appellants as grounds for reversal, and finding no error in the record, the judgment of the court below is affirmed.

*Judgment affirmed.*